UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TWIN CITY FIRE INSURANCE COMPANY, | ) ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | 13-CV-1608-SCJ |
| | ) | |
| -v- | ) | |
| | ) | |
| HARTMAN, SIMONS & WOOD, LLP, GIL Y. BURSTINER, STEPHANIE B. SKIDMORE, and ROBERT SIMONS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF
UNDISPUTED FACTS AND STATEMENT OF ADDITIONAL
<u>FACTS WHICH PRESENT A GENUINE ISSUE FOR TRIAL</u>**

Pursuant to Local Rule 56.1(B)(2), Defendants Hartman, Simons &

Wood, LLP, Gil Y. Burstiner, Stephanie B. Skidmore, and Robert Simons

respond as follows to Plaintiff Twin City Fire Insurance Company's

Statement of Undisputed Material Facts. Defendants also set forth below

additional facts which are material and present a genuine issue for trial.

**RESPONSE TO PLAINTIFF'S
STATEMENT OF UNDISPUTED FACTS**

1. Twin City issued three professional liability policies to Hartman,

Simons, Spielman & Wood LLP ("Hartman Simons"), the first for policy

period December 31, 2007-December 31, 2008 (the "2008 Policy"), the second for policy period December 31, 2008-December 31, 2009 (the "2009 Policy") and the third for the policy period December 31, 2009-December 31, 2010 (the "2010 Policy"; collectively, the "Policies").

**RESPONSE:** Admitted.

**The 2007-2008 Policy Application and the 2008 Policy**

2.  Hartman Simons submitted an application for professional liability insurance to Twin City in October 2007 (the "2007-2008 Policy Application"). Declaration of Faye Brooks in Support of Twin City's Motion for Partial Summary Judgment ("Brooks Decl.") ¶6, Ex. 4.

**RESPONSE:** Admitted.

3.  Robert Simons completed the 2007-2008 Policy Application on behalf of Hartman Simons. Brooks Decl. ¶6, Ex. 4. See also Declaration of Edward B. Parks, II in Support of Twin City's Motion for Partial Summary Judgment ("Parks Decl."), Ex. 1 at 109:18-20.

**RESPONSE:** Admitted.

4. As managing partner, Mr. Simons was responsible for completing Hartman Simons' insurance applications. Parks Decl., Ex. 1 at 109:18-20.

**RESPONSE:** Admitted.

5.    The 2007-2008 Policy Application was written on a St Paul Travelers Form but, in accordance with Twin City's underwriting practices, Twin City relied on the statement in the St. Paul Travelers Form. Brooks Decl., Ex. 1 at Endorsement No. 6; Parks Decl., Ex. 2 at 123:3-20, Ex. 3 at 19:4-8.

**RESPONSE:** Defendants admit that the 2007-2008 Policy Application was written on a St Paul Travelers Form. Defendants deny that Twin City relied on all of the representations in that application, however, as they were never material to Twin City's underwriting. For instance, Twin City's own applications contain no questions at all regarding the applicant's malpractice reporting procedures. [Exs. 87, 98 and 99; Probolus Dep., at 96:10-17]. Moreover, Twin City agreed to provide coverage based on the 2007-2008 Policy Application despite the absence of required details on the firm's procedures. [Probolus Dep., at 44:10-45:18, 87:9-88:4].

6. In the 2007-2008 Policy Application, Mr. Simons represented that Hartman Simons had procedures in place "[r]equir[ing] that firm management regularly review the status and direction of all firm matters." Brooks Decl., Ex. 4 at TWINCITY001342.

**RESPONSE:** Admitted.

7.   In the 2007-2008 Policy Application, Mr. Simons represented that Hartman Simons had procedures in place "[r]equir[ing] that all attorneys provide a thorough update to firm management of any problem files or cases." Id.

**RESPONSE:** Admitted.

8.   In the 2007-2008 Policy Application, Mr. Simons represented that Hartman Simons had procedures in place "requir[ing] formal internal training sessions on the firm policies and procedures for new lawyers who will become involved in the firm's real estate practice." Id. at TWINCITY001365.

**RESPONSE:** Admitted.

9.   At the time it submitted the 2007-2008 Policy Application, Hartman Simons did not have procedures in place "[r]equir[ing] that firm management regularly review the status and direction of all firm matters." Parks Decl., Ex. 5 at 111:12-114:18.

**RESPONSE:** Denied. As Twin City itself concedes, Mr. Simons served as the firm's managing partner for more than a decade, doing "anything and everything" for the firm, including all day-to-day operations and oversight of the firm. *See* Memorandum, at 18; Simons Dep., at 21:19-22. In addition, Twin City's citation does not support the alleged fact.

10.   At the time it submitted the 2007-2008 Policy Application, Hartman Simons did not have procedures in place "[r]equir[ing] that all attorneys provide a thorough update to firm management of any problem files or cases." Parks Decl., Ex. 4 at 81:6-25; Ex. 1 at 39:20-47:22.

**RESPONSE:** Twin City's citation does not support the alleged fact. Defendants further deny that they did not have procedures in place "[r]equir[ing] that all attorneys provide a thorough update to firm management of any problem files or cases." *See* Simons Dep., at 42:15-43:06, 125:16-18, and 224:08-11; Wood Dep., at 24:11-22; Burstiner Dep., at 119:1-2 and 120:23-121:3; Defendants' Resp. to Interrog. 5; Second Simons Decl. [Dkt. 80-4] p. 13-14, Ex. A, at § 2.4].

11.   At the time it submitted the 2007-2008 Policy Application, Hartman Simons did not have procedures in place "requir[ing] formal internal training sessions on the firm policies and procedures for new lawyers who will become involved in the firm's real estate practice." Parks Decl., Ex. 4 at 81:6-25; Ex. 1 at 39:20-47:22.

**RESPONSE:** Twin City's citation does not support the alleged fact. Defendants further deny that they did not have procedures in place "requir[ing] formal internal training sessions on the firm policies and

procedures for new lawyers who will become involved in the firm's real estate practice." [Second Simons Decl. [Dkt. 80-4] at ¶¶ 8, 9, and 14, Ex. A].

12. Mr. Simons never instructed Mr. Burstiner when or how to report potential malpractice claims. Parks Decl., Ex. 1 at 39:20-47:22, 121:7-127:15; Ex. 5 at 118:16-120:22.

**RESPONSE:** Twin City's citation does not support the alleged fact.

13. Mr. Simons never instructed Ms. Skidmore when or how to report potential malpractice claims. Parks Decl., Ex. 4 at 81:6-25.

**RESPONSE:** Twin City's citation does not support the alleged fact.

14. Mr. Simons never instructed any of the attorneys at Hartman Simons when or how to report potential malpractice claims. Parks Decl., Ex. 1 at 39:20- 47:22, 121:7-127:15.

**RESPONSE:** Twin City's citation does not support the alleged fact.

15. Ms. Skidmore never received any training at Hartman Simons regarding when or how to report potential malpractice claims. Parks Decl., Ex. 4 at 81:6-25; Ex. 1 at 39:20-47:22, 121:7-127:15.

**RESPONSE:** Defendants admit that Ms. Skidmore does not recall receiving any training at Hartman Simons regarding when or how to report potential malpractice claims.

16. Hartman Simons does not provide formal training to new lawyers regarding when or how to report potential malpractice claims. Id.

**RESPONSE:** Denied. *See* Simons Dep., at 42:15-43:06, 125:16-18, and 224:08-11; Wood Dep., at 24:11-22; Burstiner Dep., at 119:1-2 and 120:23-121:3; Second Simons Decl., Ex. A, at § 2.4. Twin City's citation does not support the alleged fact.

17.   Other than sexual harassment training, Hartman Simons does not provide formal training to new lawyers in the real estate practice regarding firm policies and procedures. Parks Decl., Ex. 4 at 82:1-6.

**RESPONSE:** Denied. *See* Second Simons Decl. [Dkt. 80-4] at ¶¶ 8, 9, and 14, Ex. A. Twin City's citation does not support the alleged fact.

18.   After reviewing the 2007-2008 Policy Application, Twin City requested that Hartman Simons provide additional information regarding its practices and operations before confirming the policy. Parks Decl., Ex. 3 at 55:12-57:3.

**RESPONSE:** Denied. Twin City asked for clarification on one area of the firm's practice and for answers to two questions, but did not ask for any additional information on the firm's procedures raised in Twin City's motion. [Probolus Dep., at 55:12-57:3; Ex. 92].

19. In addition, Twin City requested, and Hartman Simons provided, a warranty letter in December 2007, confirming there were no material changes in the information submitted in the 2007-2008 Policy Application; confirming no one covered by the 2008 Policy had knowledge of circumstances that may give rise to a claim; and acknowledging that Twin City was issuing the 2008 Policy "in reliance upon the materials submitted and the assurances contained in this letter." Brooks Decl. ¶7, Ex. 5; Parks Decl., Ex. 3 at 57:1-17.

**RESPONSE:** Admitted.

20.   Relying on the veracity of Mr. Simons' responses in the 2007-2008 Policy Application and 2007 Warranty Letter, Twin City issued the 2008 Policy. Brooks Decl. ¶3, Ex. 1; Parks Decl., Ex. 3 at 61:13-16, 63:23-64:22, 65:8-10, 72:2-11; Ex. 2 at 119:9-120:9.

**RESPONSE:** Admitted.

21. Had Twin City know that the statements in the 2007-2008 Policy Application and 2007 Warranty Letter were false, Twin City would not have issued the 2008 Policy. Parks Decl., Ex. 2 at 116:14-119:7, 120:10-121:19; Ex. 3 at 64:4-22, 65:4-25, 69:5-12.

**RESPONSE:** Denied. *See* Probolus Dep., at 28:16-25, 31:3-13, 38:15-40:2, 42:11-16, 50:13-25; and 87:9-90:10; Ex. 86.

**The 2008-2009 Policy Application and the 2009 Policy**

8

22.  By application dated December 10, 2008, Mr. Simons, on behalf of Hartman Simons, completed a renewal application and submitted same to Twin City ("2008-2009 Policy Application"). Brooks Decl. ¶9, Ex. 6.

**RESPONSE:** Admitted.

23.  In the 2008-2009 Policy Application, Simons represented that there had been no changes in any of Hartman Simons' systems and procedures for firm management and administration since the 2008-2009 Policy Application. Brooks Decl., Ex. 6 at TWINCITY001563.

**RESPONSE:** Twin City's citation does not support the alleged fact. The 2008-2009 Policy Application represented that there had been no changes in certain *specified* areas of firm management and administration identified in question 15. Ex. 96, at p. 3 (TWINCITY001563).

24. In addition, Simons submitted a warranty letter to Twin City dated December 23, 2008, in which Simons represented that there were no material changes to the information provided in the 2008-2009 Policy Application; that no one covered by the requested insurance had knowledge of circumstances that may give rise to a claim; that any claim based on circumstances of which a person had knowledge would be "excluded from coverage under the proposed insurance;" that the letter was circulated "to each attorney in the

firm;" and that Twin City relied upon the representations contained in the warranty letter and 2008-2009 Policy Application. Brooks Decl., Ex. 7.

**RESPONSE:** Admitted.

25. Relying on Simons' representations in 2008-2009 Policy Application and 2008 Warranty Letter, as well as the information provided in the 2008-2009 Policy Application, Twin City issued the 2009 Policy. Brooks Decl. ¶3, Ex. 2; Parks Decl., Ex. 2 at 108:2-109:11, 110:12-112:13, 121:21-122:14.

**RESPONSE:** Admitted.

26. The 2009 Policy provides coverage "only to claims first made against the insured during the policy period or applicable extended reporting period and reported in writing to [Twin City] immediately but in no event later than sixty (60) calendar days after the expiration date of the policy period or within any applicable extended reporting period." Brooks Decl., Ex. 2 at TWINCITY000004.

**RESPONSE:** Admitted.

27. Defendants did not purchase an extended reporting period in connection with the 2009 Policy. Brooks Decl. ¶5.

**RESPONSE:** Admitted.

28. Had Twin City know that the statements in the 2007-2008 and 2008-2009 Policy Applications and 2008 Warranty Letter were false, Twin

City would not have issued the 2009 Policy. Parks Decl., Ex. 2 at 116:14-119:7, 120:10-121:19; Ex. 3 at 64:4-22, 65:4-25, 69:5-12.

**RESPONSE:** Denied. *See* Probolus Dep., at 28:16-25, 31:3-13, 38:15-40:2, 42:11-16, 50:13-25; and 87:9-90:10; Ex. 86.

**The 2010 Policy Application and the 2010 Policy**

29. Hartman Simons submitted a renewal application for professional liability insurance coverage to Twin City on December 9, 2009 ("2009-2010 Policy Application," together with the 2008 Policy Application and 2009 Policy Application, the "Applications"). Brooks Decl. ¶12, Ex. 8

**RESPONSE:** Admitted.

30.    Mr. Simons completed the 2009-2010 Policy Application on behalf of Hartman Simons. Brooks Decl., Ex. 8; Parks Decl., Ex. 1 at 109:18-20, 112:9-19.

**RESPONSE:** Admitted.

31.  Mr. Simons represented in the 2009-2010 Policy Application that there were no changes made in any areas of firm management and administration, including firm management procedures, since the 2009-2010 Policy Application. Brooks Decl., Ex. 8 at TWINCITY001380.

**RESPONSE:** Twin City's citation does not support the alleged fact. The 2008-2009 Policy Application represented that there had been no

changes in certain *specified* areas of firm management and administration identified in question 15. Ex. 98, at p. 3.

32. In the 2009-2010 Policy Application, Mr. Simons represented that no attorney at the firm had been made aware of a claim or circumstances that could result in a claim. Id. at TWINCITY001381.

**RESPONSE:** Admitted.

33. Mr. Simons did not instruct the other attorneys that they were obligated to tell him of circumstances that could result in a claim. Parks Decl., Ex. 1 at 39:20-47:22, 121:7-127:15; Ex. 4 at 81:6-25.

**RESPONSE:** While Defendants admit that Mr. Simons did not personally instruct all of the other attorneys at Hartman Simons that they were obligated to tell him of circumstances that could result in a claim, that procedure was communicated to the other attorneys through their on-the-job training. Simons Dep., at 43:7-16.

34. Prior to submitting the 2009-2010 Policy Application, Mr. Simons did not ask all other attorneys in the firm whether they were aware of claims or circumstances that could result in a claim. Parks Decl., Ex. 1 at 39:20-47:22, 121:7-127:15.

**RESPONSE:** Admitted.

35.  Prior to submitting the 2009-2010 Policy Application, Mr. Simons asked only one other attorney at the firm whether he was aware of circumstances that could result in a claim, which attorney did not have any more information regarding pending and potential claims than did Simons himself. Id.

**RESPONSE:** Defendants admit that Mr. Simons recalled asking only one other attorney at the firm whether he was aware of circumstances that could result in a claim in connection with the 2009-2010 Policy Application. Twin City's citation does not support the remaining alleged fact.

36.  Mr. Simons also provided a warranty letter, dated January 5, 2010, to at least one of its professional liability insurers, in which Simons confirmed the statements in the 2009-2010 Policy Application and confirmed that there were no material changes to the statements in the 2009-2010 Policy Application since the date it was signed. Brooks Decl., Ex. 9; Parks Decl., Ex. 2 at 149:14-19.

**RESPONSE:** Admitted.

37.  Twin City approved the 2009-2010 Policy Application based on Mr. Simons' responses to questions therein, as well as responses provided in the 2007-2008 and 2008-2009 Policy Applications, and issued the 2010 Policy.

Brooks Decl. ¶3, Ex. 3; Parks Decl., Ex. 2 at 108:2-109:11, 110:12-112:13, 121:21-122:14.

**RESPONSE:** Defendants admit that Twin City approved the 2009-2010 Policy Application based on Mr. Simons' responses to questions therein. Defendants deny that the 2010 Policy was issued based on the representations in the 2007-2008 and 2008-2009 Policy Applications as the 2009-2010 Policy Application did not incorporate prior applications and did not include any warranty that responses in prior applications were correct. [Probolus Dep. 91:3-14; Exs. 98 and 99].

38.    On December 22, 2009, after Hartman Simons submitted the 2009-2010 Policy Application, but before Twin City issued the 2010 Policy, Twin City sent Hartman Simons an insurance binder ("Binder"). Brooks Decl. ¶15, Ex. 10.

**RESPONSE:** Admitted.

39.    In the Binder, Twin City reminded Hartman Simons that Hartman Simons had a duty to notify Twin City of any changes that occurred after the 2009- 2010 Policy Application was submitted, including "any material change in the information requested by and/or submitted to The Hartford." Brooks Decl., Ex. 10 at TWINCITY001908.

**RESPONSE:** Admitted.

14

40. Defendants did not notify Twin City of any changes prior to the inception of the 2010 Policy. Brooks Decl. ¶15.

**RESPONSE:** Admitted.

41. The Policies incorporate the statements and representations provided by Defendants in the Applications. Specifically, the Policies provide: "By accepting this policy, you agree: 1. The statements and representations in the application submitted to us are accurate and complete; and 2. We have issued this policy in reliance upon your statements and representations." Brooks Decl., Ex. 1 at Section III: Conditions -- Claims, ¶G, Ex. 2 at TWINCITY000013, Ex. 3 at TWINCITY000042.

**RESPONSE:** Denied. Each policy issued by Twin City incorporates only the statements and representations provided by the Defendants in the application submitted for that particular policy. As quoted by Twin City, the policies provide that "By accepting this policy, you agree: 1. The statements and representations in the *application* submitted to us are accurate and complete …." Ex. 43, Section III: Conditions -- Claims, ¶G (emphasis added).

42.  Had Twin City known that the statements in the 2007-2008, 2008- 2009 and 2009-2010 Policy Applications were false, Twin City would not have issued the 2010 Policy. Parks Decl., Ex. 2 at 116:14-119:7, 120:10-121:19; Ex. 3 at 64:4-22, 65:4-25, 69:5-12.

**RESPONSE:** Denied. *See* Probolus Dep., at 28:16-25, 31:3-13, 38:15-40:2, 42:11-16, 50:13-25; and 87:9-90:10; Ex. 86.

**The Underlying Litigation**

43.   In autumn 2009, the Bank of North Georgia ("Bank") asked Stephanie Skidmore and Gil Burstiner to prepare a guaranty release agreement, to release Northside Guaranty, LLC ("Northside") from its guaranty on a certain loan in exchange for a release of a second mortgage held by John Williams on another property. Parks Decl., Ex. 6; Ex. 4 at 16:6-17:24; Ex. 5 at 146:22-147:1.

**RESPONSE:** Admitted.

44.   The Bank instructed Hartman Simons to prepare a release agreement that only released one specific financial obligation to the Bank. Parks Decl., Ex. 4 at 17:3-24; Ex. 8 at 24:5-14.

**RESPONSE:** Admitted.

45.   Ms. Skidmore prepared the release agreement, with input from counsel for Northside. Parks Decl., Ex. 4 at 17:3-24.

**RESPONSE:** Admitted.

46. On October 23, 2009, representatives from the Bank and Northside executed the release agreement ("Release Agreement"). Brooks Decl., Ex. 11 at B-00006517-B-00006524.

**RESPONSE:** Admitted.

47. Mr. Burstiner did not review the final version of the Release Agreement before it was executed by the Bank. Parks Decl., Ex. 4 at 22:12-16; Ex. 5 at 15:11-25.

**RESPONSE:** Admitted.

48. In November 2009, Mr. Burstiner and Ms. Skidmore learned that Northside was contending that the Release Agreement operated to release a host of financial obligations to the Bank, rather than just releasing one guaranty. Parks Decl., Ex. 7.

**RESPONSE:** Admitted.

49. In December 2009, Mr. Burstiner and Ms. Skidmore learned that at least fifty-eight individuals and entities (the "Northside Releasees") alleged the Release Agreement released them from all claims and liabilities to the Bank and its affiliates, totaling approximately $60 million. Brooks Decl., Ex. 14; Parks Decl., Ex. 9.

**RESPONSE:** Twin City's citation does not support the alleged fact.

50. No later than December 8, 2009, Mr. Burstiner and Ms. Skidmore were aware that certain persons and entities were contending that an agreement prepared by Hartman Simons operated to release approximately $60 million in financial obligations to the Bank. Id.

**RESPONSE:** Twin City's citation does not support the alleged fact.

51.   The Northside Releasees' assertion in November and December 2009 that the Release Agreement released them from all financial obligations to the Bank was contrary to the Bank's instruction to Hartman Simons regarding the drafting and purpose of the Release Agreement. See Parks Decl., Ex. 6; Ex. 4 at 17:3-7, 19-24; Ex. 8 at 22:5-24:14.

**RESPONSE:** Admitted.

52.   No later than December 8, 2009, Mr. Burstiner and Ms. Skidmore were aware of circumstances that could give rise to a potential malpractice claim against them and/or Hartman Simons. Brooks Decl., Ex. 14.

**RESPONSE:** Paragraph 52 states a conclusion rather than a fact, which Defendants categorically deny. In addition, Twin City's citation does not support the alleged fact.

53. Neither Mr. Burstiner nor Ms. Skidmore informed Mr. Simons in December 2009 that a document Hartman Simons prepared for a client was being interpreted adversely to that client. Parks Decl., Ex. 1 at 133:19-23.

**RESPONSE:** Admitted.

54. Neither Mr. Burstiner nor Ms. Skidmore informed Mr. Simons in December 2009 that litigation had been threatened against their client to

determine the scope and effectiveness of a document Hartman Simons prepared. Parks Decl., Ex. 1 at 39:20-47:22, 121:7-127:15, 133:19-23.

**RESPONSE:** Admitted.

55.  In January 2010, Ms. Skidmore and Mr. Burstiner were aware that the Northside Releasees were continuing to allege that the Release Agreement released them from all financial obligations to the Bank. Parks Decl., Ex. 10; Ex. 11; Ex. 12 at 48:10-19, 44:23-45:10.

**RESPONSE:** Admitted.

56. On June 16, 2010, the Northside Releasees commenced two actions against the Bank, seeking declarations that the Release Agreement prepared by Hartman Simons released them of all obligations to the Bank (the "Underlying Litigations"). Brooks Decl, Ex 11 at B-00006505-B-00006542.

**RESPONSE:** Admitted.

57.  The Bank sent a letter to Mr. Burstiner on June 24, 2010 reserving its rights against Mr. Burstiner and Hartman Simons relating to the Release Agreement and the Underlying Litigations. Brooks Decl., Ex. 11.

**RESPONSE:** Admitted.

58. Charles Wood, a retired partner at Hartman Simons, instructed Mr. Burstiner to tell Mr. Simons of the June 24, 2010 letter. Parks Decl., Ex. 13

at 51:1-54:12. Mr. Wood then followed up to confirm that Mr. Burstiner had spoken with Mr. Simons. Id.

**RESPONSE:** Admitted.

59.   Defendants first provided notice to Twin City of the Bank's claim against Defendants on July 14, 2010. Brooks Decl. ¶16, Ex. 11.

**RESPONSE:** Twin City's citation does not support the alleged fact. The Defendants reported the potential claim to their insurance broker prior to July 14, 2010, who in turn agreed to report it to Twin City. Simons Dep., at 147:8-149:11.

60.   Although Mr. Burstiner did not notify Twin City of the litigation until July 14, 2010, on July 13, 2010, Mr. Burstiner informed the Bank that he had already notified his malpractice carrier of the problems created by the Release Agreement, but that his malpractice carrier had not yet appointed counsel. Brooks Decl., Ex.11. This was a lie. Compare Brooks Decl. ¶16.

**RESPONSE:** Denied. The Defendants reported the potential claim to their insurance broker prior to July 14, 2010, who in turn agreed to report it to Twin City. Simons Dep., at 147:8-149:11; Burstiner Dep., at 178:22-179:18.

61.   For seven months, Defendants did not notify Twin City of the Northside Releasees' allegations, although they knew the matter remained in dispute. Parks Decl., Ex. 5 at 109:2-110:1, 146:22-147:1, 148:2-5; Ex. 12 at

48:10-19, 44:23-45:10.

**RESPONSE:** Denied.

62. When Defendants provided notice of the claim to Twin City, they did not inform Twin City that Mr. Burstiner and Ms. Skidmore were aware in November and December 2009 that multiple persons and entities were alleging that the Release Agreement operated to release tens of millions of dollars of financial obligations to the Bank. Brooks Decl. ¶17.

**RESPONSE:**  Defendants admit that they did not inform Twin City about any discussions that took place in 2009 because that information was never requested by Twin City. Defendants offered to provide any additional information needed by Twin City, however, no such information was requested until July 2011. [Exs. 25 and 57, Brooks Dep., at 29:2-31:24].

63. When Defendants provided notice of the claim to Twin City, they did not provide Twin City with any of the letters or emails communicated in November and December 2009 regarding the Release Agreement. Id.; Parks Decl., Ex. 5 at 173:3-24.

**RESPONSE:** Defendants admit that they did not inform Twin City about any discussions that took place in 2009 because that information was never requested by Twin City. Defendants offered to provide any additional

documents needed by Twin City, however, none were requested until July 2011. [Exs. 25 and 57, Brooks Dep., at 29:2-31:24].

64. Defendants tendered the claim to Twin City under the 2010 Policy. Brooks Decl., Ex. 13.

**RESPONSE:** Twin City's citation does not support the alleged fact.

65.    Twin City agreed to provide Defendants with a defense under the 2010 Policy, subject to a complete reservation of all rights. Brooks Decl. ¶18, Ex. 13. Hartman Simons made no objection to Twin City's reservation of rights. Brooks Decl. ¶18.

**RESPONSE:** Denied as stated. Defendants admit that Twin City agreed to provide a defense to the Defendants subject to a "reservation of any and all rights under the [2009-2010] policy." Ex. 26. Twin City did not assert any right of reimbursement or recoupment, nor did it reserve any rights under the 2008-2009 policy. *Id.* Because Twin City was only reserving its contractual rights under the 2009-2010 policy, Defendants had no reason to object.

66.    On July 13, 2011, Twin City sent a letter to Hartman Simons reiterating Twin City's reservation of rights. Brooks Decl., Ex. 14. Hartman Simons did not object to Twin City's reservation. Brooks Decl., Ex. 15.

**RESPONSE:** Defendants admit that Twin City's coverage counsel sent a new reservation of rights letter raising a new coverage defense in July 2011. Ex. 56. Once again, Twin City did not assert any right of reimbursement or recoupment, nor did it reserve any rights under the 2008-2009 policy. *Id.* Because Twin City was only reserving its contractual rights under the 2009-2010 policy, Defendants had no reason to object.

67. When Defendants tendered the claim to Twin City in July 2010, Defendants did not contend that the 2009 Policy provided coverage for the Bank's claim against Defendants. Brooks Decl. ¶19.

**RESPONSE:** Admitted. As of July 2011, however, Twin City was on notice that the Defendants contended that coverage may exist under the 2008-2009 Policy as well. [Ex. 58].

68. Defendants do not currently contend that the 2009 Policy provides coverage for the Bank's claim against Defendants. Parks Decl., Ex. 1 at 106:10-107:18.

**RESPONSE:** Denied. Defendants continue to assert that coverage for the Bank's claim against the Defendants may exist under the 2008-2009 Policy. [Ex. 58].

69. Defendants first provided notice of the Bank's claim to their insurance broker, Angela Fleege, on December 2, 2010. Parks Decl., Ex. 14.

**RESPONSE:** Denied. The Insureds reported the potential claim to their insurance broker prior to July 14, 2010. Simons Dep., at 147:8-149:11.

70.   In January 2013, the trial judge in the Underlying Litigations issued two orders, both granting summary judgment to plaintiffs against the Bank (the "Orders"). Parks Decl., Ex. 15; Ex. 16.

**RESPONSE:** Admitted.

71. Among other things, in the Orders, the judge held that the Release Agreement was "unambiguous" and that the Bank's "intention to grant a general release of all claims, contracts and liability is stated clearly on the face of the document." Parks Decl., Ex. 15 at TWINCITY000449.

**RESPONSE:** Admitted.

72.   The judge held that the "general release in Paragraph 11 plainly states [the Bank's] intention to release all claims, contracts and liabilities." Id.

**RESPONSE:** Admitted.

73.  By letter dated April 9, 2013, counsel for the Bank asserted a legal malpractice claim against Stephanie Skidmore, Gil Burstiner and Hartman Simons "arising from the release language in the Guaranty Release agreement dated October 23, 2009." Parks Decl., Ex. 17 at TWINCITY000359.

**RESPONSE:** Admitted.

74.  In that letter, the Bank demanded that "policy limits of Ten Million Dollars ($10,000,000)" in exchange for a release of the Bank's claims against the Defendants. Id. at TWINCITY000360.

**RESPONSE:** Admitted.

75.  By letter dated April 19, 2013, Defendants "demand[ed]" that Twin City take this opportunity to "settle the claim within its policy limits." Brooks Decl., Ex. 16 at HSW007944.

**RESPONSE:** Admitted.

76.  Twin City notified Defendants of Twin City's intention to accept the settlement demand "under a full reservation of rights regarding the coverage dispute between Hartford and Hartman, Simons over whether the underlying suit and in turn the settlement are covered." Brooks Decl. ¶25, Ex. 17.

**RESPONSE:**  Admitted. Defendants' however, immediately objected to Twin City's unilateral reservation of rights – particularly any proposed right of recoupment that had never previously been raised and was not a right granted by its policies. Ex. 80.

77. Before agreeing to the settlement demand, Twin City commenced litigation against Defendants, seeking an adjudication of the parties'

respective rights and obligations regarding the malpractice claim, the Policies, and the settlement payment. Brooks Decl. ¶25, Ex. 17.

**RESPONSE:**  Defendants admit that Twin City filed this action before it accepted the Bank's settlement demand.

## DEFENDANTS' STATEMENT OF ADDITIONAL FACTS WHICH PRESENT A GENUINE ISSUE FOR TRIAL

1.    Twin City's policies state that they "contain[] all the agreements between you and us concerning the insurance afforded" [Exs. 41 and 43, § IV.C.].

2.    Twin City's policies allow for modifications of their terms only through the issuance of an endorsement: "The policy's terms can be amended or waived only by an endorsement issued by us as part of this policy." [Exs. 41 and 43, § IV.D].

3.    Since 2005, Twin City has used its own initial application to underwrite new customers for legal malpractice policies. [Ex. 87; Probolus Dep., at 17:10-19:3].

4.    Twin City's initial application does not contain any questions regarding the applicant's internal procedures for reporting potential malpractice claims. [Ex. 87; Probolus Dep., at 96:10-17].

5.     As a result, Twin City typically did not inquire into applicants' practices and procedures for reporting potential malpractice claims. [Probolus Dep., at 96:10-97:21].

6.     The 2007 Application submitted by the Insureds to Twin City in December 2007 on a form prepared by St. Paul Travelers. [Ex. 91].

7.     In all, the Insureds answered more than 33 questions on the 2007 Application with a "no." [Ex. 91].

8.     Despite the "no" responses in the Insureds' 2007 Application, Twin City agreed to issue a policy to the Insureds. [Probolus Dep., at 51:24-53:4].

9.     The "Oversight, Peer Review, and Internal Communications" section of the 2007 Application required the applicant to include a narrative description of its procedures if any question was answered "no." [Ex. 91, at questions 27-31].

10.     While the Insureds answered "no" to three questions in the "Oversight, Peer Review, and Internal Communications" section of the 2007 Application, the Insureds did not include any narrative explanation of those procedures. [Ex. 91].

11.    Question 29 of the 2007 Application required a narrative explanation of the firm's training program if answered "yes." [Ex. 91, at question 29].

12.    While the Insureds answered "yes" to question 29 of the 2007 application, the Insureds' application did not include any narrative explanation of its training program. [Ex. 91].

13.    Despite the absence of narrative explanations of the firm's Oversight, Peer Review, and Internal Communications procedures and training program in the 2007 Application, Twin City nevertheless agreed to provide coverage to the Insureds. [Probolus Dep., at 44:10-45:18, 87:9-88:4].



14.    [Probolus Dep., at 88:14-24].

15.    [Probolus Dep., at 89:7-12].

16.    [Probolus Dep., at 50:13-25; 89:17-90:10].

17.   According to Twin City's own underwriter, the Insureds' procedure for reporting potential malpractice claims – as explained by Messrs. Simons, Wood, and Burstiner – was appropriate. [Probolus Dep., at 85:14-86:1].

18.   The Insureds submitted renewal applications to Twin City in December 2008 and December 2009. [Exs. 99 and 98].

19.   The renewal applications submitted to Twin City by the Insureds did not contain any questions regarding the firm's internal procedures for reporting potential malpractice claims. [Exs. 99 and 98; Probolus Dep., at 96:10-17].

20.   ███████████████████████████████████████████

███████████████████████████████████████████

███████████████   [Probolus Dep., at 28:16-25; Ex. 86].

21.   The renewal applications submitted to Twin City by the Insureds in December 2008 and December 2009 do not incorporate the Insureds' responses to questions in prior applications. [Exs. 99 and 98; Probolus Dep., at 90:11-91:14].

22.   The renewal applications submitted to Twin City by the Insureds in December 2008 and December 2009 do not contain any warranty that the

responses in prior applications were correct. [Exs. 99 and 98; Probolus Dep., at 90:11-91:14].

23.    Questions 27.a., 27.b., and 8 are not found in the "firm management" section of the 2007 Application. [Ex. 91, at 11, 14, & 34; Probolus Dep., at 95:7-18].

24.    Hartman Simons conducts both formal and informal training of partners, associates, and staff. [Second Simons Declaration [Dkt. 80-4] (hereinafter "Second Simons Declaration"), at ¶ 3].

25.    Upon the start of employment with the firm, all employees of Hartman Simons are provided a copy of the firm's Employee Handbook. [Second Simons Declaration [Dkt. 80-4], at ¶ 4].

26.    Each employee is required to acknowledge receipt of the Employee Handbook in writing. [Second Simons Declaration [Dkt. 80-4], at ¶ 5].

27.    Among other topics, Hartman Simons' Employee Handbook includes training on business ethics, conflicts of interest, client confidentiality, timekeeping, computer and email usage, workplace safety, and employee conduct. [Second Simons Declaration [Dkt. 80-4], Ex. A].

28.    The "Business Ethics and Conduct" section of the firm's Employee Handbook advises employees that "[i]f a situation arises where it is

difficult to determine the proper course of action; the matter should be discussed openly with your immediate supervisor and, if necessary, with the Managing Partner for advice and consultation." [Second Simons Declaration [Dkt. 80-4], p. 13-14 & Ex. A at § 2.4].

29.    All new associates at Hartman Simons participate in the firm's mentor program, whereby each associate is assigned to one or more partners or senior counsel who serve as a/the mentor attorney(s). The associates' work is delegated by his or her assigned mentor(s) and the associates' work product is likewise reviewed by the mentor. Mentors, as well as any partners within the firm, are available for any and all questions regarding firm policies and procedures. [Second Simons Declaration [Dkt. 80-4], at ¶ 9].

30.    The "Business Ethics and Conduct" section of the firm's Employee Handbook advises employees that "[i]f a situation arises where it is difficult to determine the proper course of action; the matter should be discussed openly with your immediate supervisor and, if necessary, with the Managing Partner for advice and consultation." [Second Simons Declaration [Dkt. 80-4], p. 13-14 & Ex. A at § 2.4]

31.    Hartman Simons conducts formalized annual performance evaluations of all attorney employees. [Second Simons Declaration [Dkt. 80-4], at ¶ 10].

31

32.    In addition to annual reviews, all supervisors and employees are encouraged to discuss job performance and goals on an informal and frequent basis. [Second Simons Declaration [Dkt. 80-4], p. 15 at ¶ 11, Ex. A.].

33.    All attorneys at Hartman Simons are required to take the required CLE courses as necessary to maintain their applicable bar licenses, including ethics and professionalism. Some CLE courses are conducted at the firm and some CLE videos are obtained from the Georgia Bar and viewed at the firm.  [Second Simons Declaration [Dkt. 80-4], at ¶ 12].

34.    Hartman Simons also conducts regular "lunch and learn" training programs on topics relevant to the firm's practice areas. These training programs are open to all attorneys and paralegals and all associates are required to attend many of these sessions. [Second Simons Declaration [Dkt. 80-4], at ¶ 13].

35.    In addition to the formal training discussed above, all new attorneys are given on-the-job training regarding office procedures, court procedures, and substantive law in their area of practice. [Second Simons Declaration [Dkt. 80-4], at ¶ 14].

36.    Mr. Simons served as the firm's managing partner for more than a decade, doing "anything and everything" for the firm, including all day-to-day operations and oversight of the firm. [Simons Dep., at 21:17-22:22].

37.    The Bank of North Georgia routinely received demands from distressed borrowers in 2009. [Garcia Dep., at 19:6-21].

38.    The Bank's President testified that ███████████████████

███████████████████████████████████████████████

[Garcia Dep., at 19:6-21].

39.    The Bank was ███████████████████████████

███████████████████████████    [Garcia Dep., at 57:24-58:10].

40.    The Bank was ███████████████████████████

███████████████████████████████████████████████

[Garcia Dep., at 20:4-13].

41.    The Bank's President ███████████████████████

███████████  [Garcia Dep., at 60:16-61:10].

42.    The bank officer in charge of negotiating Northside's various loans, Irwin Berman, believed that the letters from borrowers' counsel in 2009 were ███████████████████████████████████

█████████████████████  [Berman Dep., at 25:16-26:9].

43.    Mr. Berman believed that Northside's position ██████████

█████████████████████  [Berman Dep., at 30:10-15].

44.    Still  other  bank  officers  ███████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████ [Dearing Dep., at 67:19 - 68:11].

45.    The  Bank's  outside  counsel  involved  in  negotiations  with  the

borrowers ███████████████████████████████████████████████████████

████████████████████████████████████████████████ [Skidmore

Dep., at 39:2-16].

46.    The  Bank ████████████████████████████████████████████

███████████████████████████████████████████ [Garcia Dep., at

50:1-15].

47.    The  Bank not only did not discuss ████████████████████████

████████████████████████████████████████████████████████████████

████████ [Dearing Dep., at 69:11].

48.    ███████████████████████████████████████████████████████

████████████████████████████████████████ [Burstiner Dep., at

163:20-165:11].

49.    Even *after* the litigation against the Bank was filed, Twin City

itself – along with its defense counsel and coverage counsel – believed that

the borrowers' claims were without merit. For example, Twin City's Assistant

Vice President likewise stated in June 2011 that ███████████████████████

34

██████████████████████████████████████████████

████████████ [Ex. 54, at p. 2].

50.    Twin City's own coverage counsel believed that the ████████

██████████████████████████████████████████████

[Ex. 61].

51.    When the trial court eventually ruled against the Bank, Twin

City's counsel reported that the summary judgment decision was ██

████████████████████ [Ex. 62]; *see also* [Ex. 66] ██████████

██████████████████████

52.    Twin City has continued to affirm coverage under the 2008-2009

Policy, defending the Insureds in a separate claim under that policy. [Simons

Dep., at 64:2-65:14].

Respectfully submitted, this 28th day of June, 2016.

FELLOWS LABRIOLA LLP

s/Christina M. Baugh
Shattuck Ely
Georgia Bar No. 246944
tely@fellab.com
Christina M. Baugh
Georgia Bar No. 241880
cbaugh@fellab.com

Peachtree Center
Suite 2300, South Tower

225 Peachtree Street, NE
Atlanta, Georgia 30303
Tel. (404) 586-9200
Fax. (404) 586-9201

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I certify that this day, I electronically filed the foregoing with the clerk's office CM/ECF system, which will send email notification to the following counsel of record:

> James P. Ruggeri, Esq.
> Edward B. Parks, II, Esq.
> Alison P. Baker, Esq.
> Shipman & Goodwin LLP
> 1875 K Street NW
> Washington DC 20006

I further certify that this day, I served a copy of the foregoing via Hand-Delivery to the following counsel of record:

> Philip W. Savrin, Esq.
> Freeman, Mathis & Gary
> 100 Galleria Parkway, Suite 1600
> Atlanta, GA 30339-5948

Respectfully submitted, this 28th day of June, 2016.

> *s/ Christina M. Baugh*
> Christina M. Baugh